American Electric Company, Ltd. v. Commissioner.
American Electric Co. v. Commissioner
Docket No. 2125-63.
United States Tax Court
T.C. Memo 1966-76; 1966 Tax Ct. Memo LEXIS 205; 25 T.C.M. (CCH) 428; T.C.M. (RIA) 660076; April 13, 1966
Howard K. Hoddick, 318 First National Bank Bldg., Honolulu, Hawaii, for the petitioner. James B. Booher, for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined a deficiency in petitioner's income tax for the fiscal year ending October 31, 1959 in the amount of $25,322.20. The issues are whether respondent erred (1) in increasing petitioner's contract income for the taxable year by $52,934, and if not, whether petitioner is entitled, in the alternative, to a bad debt or other deduction in the amount of $52,934; (2) in disallowing a deduction of $1,200 for entertainment expenses claimed by petitioner; and (3) in disallowing $2,805.47 in automobile expenses claimed by petitioner. Findings of Fact The stipulated facts are so found, and are incorporated herein by this reference. *207 Petitioner is a Hawaiian corporation, organized in 1946 and engaged in the electrical contracting business. It filed its income tax return for its fiscal year ended October 31, 1959 with the district director of internal revenue at Honolulu, Hawaii. For tax purposes, it reported its 1959 fiscal year income on a completed-contract basis of accounting. Nordic Construction, Ltd., sometimes referred to as Nordic, is a Hawaiian corporation. It is a general contracting firm that specializes in the construction of commercial buildings. It does no electrical contracting work. None of the officers and stockholders of Nordic own stock in the petitioner, and none of petitioner's officers and stockholders own stock in Nordic. Prior to the taxable year and even before 1950, Nordic had entered into subcontracts with petitioner for electrical work. On September 14, 1954, petitioner and Nordic obtained an option to lease approximately 15 acres of land situated in Kaneohe, City and County of Honolulu. They planned to construct and operate a modern shopping center and gas station thereon if financing could be arranged. The option was obtained from Kaneohe Ranch Company, Ltd., a Hawaiian corporation *208 and three individuals. Thereafter, and under date of September 11, 1956, Nordic and petitioner advised the other contracting parties that they had assigned their interests in and under the option agreement, as authorized by such instrument, to Windward City, Ltd., a Hawaiian corporation, sometimes referred to as Windward, organized for the purpose of exercising the option and constructing and operating the proposed shopping center. Under date of November 1, 1956, Windward leased the land upon which it held the option for a term of 55 years. Prior to the time that Windward was incorporated Nordic expended $21,891.77 and petitioner expended $16,301.08 to develop the shopping center on the optioned land. Windward City, Ltd., was formed on September 11, 1956. It engaged in the business of developing and operating a shopping center on the land leased November 1, 1956. The officers and directors of Windward at its formation were: President and Di-
Marvin G. Elton
rector
(vice-president of Nordic)
Vice-President and
Carlo Panfiglio
Director
(president of petitioner)
Secretary and Di-
Howard K. Hoddick
rector
(counsel for petitioner and
Windward)
Treasurer and Di-
Howard L. Cook
rector
(an architect)
Director
John F. Child, Jr.
(a leasing agent)
Director
Charles W. Hulick
(vice-president of peti-
tioner)
Director
Oscar H. Winne
(vice-president of Nordic)
Director
Archer T. Osler
(president of Nordic)
*209 The foregoing named individuals continued to serve as Windward's officers and directors until September 8, 1958, when the following persons were elected to serve in the following offices and as directors: Directors
Office
Marvin G. Elton
President
Carlo Panfiglio
Vice-President and
Treasurer
John F. Child, Jr.
Second Vice-President
Richard Strawn
Assistant Treasurer
Howard K. Hoddick
Secretary
Howard L. Cook
Assistant Secretary
Kenneth Char On May 11, 1959 Kenneth Char's resignation as director was accepted and Henry Clark of Castle & Cooke, Ltd., was appointed as a director. Windward's initial stockholders and capitalization were as follows (12,500 shares authorized with a par value of $10 per share) Number
Percentage
How
Date Stockholder
of shares
of total
Paid *
Issued
Petitioner
4,000
32
$ 27,500(c)
12-20-56
12,500(p)
Nordic
4,000
32
27,500(c)
12-20-56
12,500(p)
Mr. and Mrs. J. F. Child, Jr.
2,000
16
20,000(s)
12-20-56
Mr. and Mrs. Howard Cook
1,000
8
10,000(s)
12-20-56
Mr. and Mrs. George Wimberly
1,000
8
10,000(s)
12-20-56
H. K. Hoddick
500
4
5,000(s)
Never Issued
Total
12,500
100
$125,000
*210 Under the terms of its lease, Windward covenanted that it would (1) commence construction of the shopping center within one year from the execution of the lease, unless extended by agreement of the parties; (2) complete the buildings outlined in its preliminary scheme or site plans by the end of the fifth year; (3) complete the construction as ultimately planned within 10 years; (4) obtain the lessors' written approval of the construction contract before starting construction; and (5) furnish the lessors a bond protecting them from mechanics' and materialmen's liens and guaranteeing completion of the construction. The last agreement included preliminary and ultimate site plans of the shopping center prepared by Wimberly & Cook, AIA, and an associate architect. By January 1957, Windward had begun spending money for construction in progress. At June 30, 1957, Windward's balance sheet showed construction in progress in the amount of $44,145.36. In December 1957, petitioner and Nordic each advanced at least $14,000 to Windward so it could pay a note to a lumber company then overdue. This advance was canceled in 1958 by the issuance *211 of capital stock in the amount of $11,050 and the issuance of a Class A debenture in the face amount of $2,950 to each. On January 20, 1958, Nordic and Windward executed an agreement as contractor and owner, respectively, for the construction of a service station and general site preparation work on the leased land. The contract price was $50,000 and the work was to be substantially completed by June 22, 1958. Nordic furnished a standard form owner's protective bond, naming Windward and the lessor as owner, and conditioned upon Nordic's faithful performance of the contract and payment of all persons furnishing labor or material for the construction. On March 20, 1958, Elton and Panfiglio, president, and vice-president and treasurer, respectively, of Windward discussed financing the proposed shopping center with representatives of Castle & Cooke, Ltd., a Hawaiian corporation, and the Bank of Hawaii. After this meeting, Panfiglio, upon invitation, attended a special meeting of the board of directors of Nordic at which he and Elton reviewed and explained an agreement between Windward and Castle & Cooke, Ltd., and the outcome of a meeting with representatives of the Bank of Hawaii, *212 Castle & Cooke, Ltd., and Windward. The minutes of this special meeting are, in part, as follows: Mr. Panfiglio advised the Board that the meeting with the Bank of Hawaii and Castle & Cooke, Ltd., was most encouraging and that he felt all parties were in agreement. He further advised the Board that it would probably take the attorneys of all parties a week or ten days to finish all the legal papers involved. Mr. Panfiglio further advised the Board that based on current figures, both Nordic Construction Ltd. and American Electric Company would have to put in another $130,000 each in the Shopping Center in order to maintain their percentage of equity, and that the construction costs could not exceed $820,000.00. The basis for Panfiglio's advice that petitioner and Nordic would have to put up $130,000 each was that the bank would finance only a certain percentage of the total costs of construction and the remaining costs had to be financed elsewhere. On April 1, 1958, Windward and Nordic signed a written contract for the construction of three buildings and the remaining site work on the shopping center for a price of $770,000. This construction, together with the $50,000 construction *213 costs covered by the agreement of January 20, 1958, comprised all the work for phase one of the Windward shopping center. On the same day, Nordic, as principal, and Royal Indemnity Company, as surety, executed a contract bond in the sum of $600,000 to assure Nordic's performance of the construction work authorized by the contract with Windward. The contract bond named Windward as owner, the Bank of Hawaii as lender, and Kaneohe Ranch, Ltd., and the three individuals as lessors. The surety's obligation was conditioned, among other things, upon Nordic's paying in full the claims for labor or materials furnished for the construction of the three buildings. On April 30, 1958, at a special meeting of its board of directors, Windward authorized its president and treasurer to enter into a financing agreement with Castle & Cooke, Ltd., whereby the latter would guarantee a mortgage loan of $600,000 from the Bank of Hawaii for a period of three years. Castle & Cooke would be paid a fee of $35,000 and be issued a $25,000 convertible debenture for such guarantee. Windward also authorized its president and treasurer to make a $600,000 mortgage loan with the Bank of Hawaii with 5 percent interest *214 for the first three years and 6 percent interest for the remaining 17 years. Windward also authorized its president and secretary to sign an escrow letter directed to the Bank of Hawaii whereby 51 percent of the outstanding stock of Windward would be held in escrow by the bank and Windward would deposit in escrow with the bank all available cash up to $90,000 during the first three years of the mortgage loan. Windward also provided for the issuance of Class A debentures as defined in an agreement with Castle & Cooke, Ltd., to the following: Petitioner
$135,285
Nordic
135,285
John F. and Julia Child
25,413
Wimberly & Cook
25,050
Howard K. Hoddick
10,237 It was also provided that such debentures should not be issued to petitioner or Nordic until they had a credit in the debenture account to be established by Windward equal to the total amount of such debentures. On April 30, 1958, Windward's stockholders readjusted their equities in the corporation as follows: Number
Percentage
Shares Stockholder
of shares
of total
Acquired
Disposed
Petitioner
5,105
40.84
1,105
Nordic
5,105
40.84
1,105
Mr. & Mrs. J. F. Child, Jr.
959
7.672
1,041
Mr. & Mrs. Howard Cook
472
3.776
528
Mr. & Mrs. Geo. Wimberly
473
3.784
527
H. K. Hoddick
386
3.088
114
Total
12,500
100.000
2,210
2,210
*215 This stock adjustment, together with the issuance of a Class A debenture for $2,950 to petitioner, canceled the $14,000 advanced in December 1957, as hereinbefore mentioned. On May 5, 1958, Windward and Nordic, as owner and contractor, respectively, entered into a supplemental agreement which modified their contracts of January 20 and April 1, 1958 for the construction of a shopping center at a total cost of $820,000. After reciting that Windward was arranging to borrow a substantial sum from the Bank of Hawaii for the costs of construction, that Castle & Cooke, Ltd., was guaranteeing such loan from the Bank of Hawaii, and that "it has been orally agreed" that Windward would pay Nordic the contract price partly in cash and partly in debentures as the construction work progressed, the parties agreed as follows: (1) At the end of each month until the said contract has been fully performed by the Contractor, a progress payment voucher shall be prepared by the Contractor and submitted to Wimberly & Cooke, AIA, architects for the Owner, for approval and also to the duly designated representative of Castle & Cooke, Ltd., for approval; (2) Upon such approval by the Owner's architect *216 and by the representative of Castle & Cooke, Ltd., having been obtained said progress payment voucher shall be submitted to the Bank of Hawaii for payment; (3) The said Bank shall withhold from said payments the following: (a) 10% of the said progress payment approved in said voucher up to a total of $50,000.00 shall be withheld by the Bank until final completion of the contract in accordance with its terms; (b) 32% of the balance of the progress payment approved in said voucher shall be withheld by the Bank and upon receipt by the Owner of notice from the Bank that said 32% has been withheld, the Owner shall credit said amount to the debenture account of the Contractor. (4) After said completion of the contract the Owner shall issue to the Contractor debentures equal to the full amount of the progress payments withheld by the Bank and credited to the said debenture account of the Contractor; The supplemental agreement was executed by Elton and Panfiglio for Windward and by Osler and Winne for Nordic. On May 7, 1958, Windward borrowed $600,000 from the Bank of Hawaii, secured by a note and mortgage. On the same day, Windward, its stockholders individually, and Castle & *217 Cooke, Ltd., entered into a financing agreement which provided, in part, that the latter corporation would guarantee a $600,000 mortgage loan from a bank to Windward. Castle & Cooke agreed to purchase this loan from the bank for a prescribed price within three years if the bank so requested and the loan was in default, and after three years, upon request of the bank. It was understood that Windward would finance construction costs above the mortgage loan and invested capital by issuing Class A debentures in the form prescribed in the agreement and that Castle & Cooke would receive $35,000 cash and a $25,000 Class B debenture from Windward with an option to convert its Class B debenture into 51 percent of Windward's capital stock if it were required to purchase the outstanding mortgage within three years of the agreement. At its election, it also had the right to convert its debenture into 20 percent of Windward's capital stock within ten years. The agreement required Windward to deposit its available cash, as defined in the agreement, into an escrow fund to be used as needed in servicing or refinancing the mortgage loan during the first three years. After this period of time Windward *218 could use amounts in the escrow fund to pay interest or principal on outstanding debentures, provided Castle & Cooke were not required to pay off or purchase the outstanding mortgage loan. On June 4, 1958, petitioner executed a standard form subcontractor's written agreement with Nordic for electrical work on the shopping center project at a price of $112,500. This agreement provided, among other things, that Nordic would pay petitioner in monthly payments for 90 percent of all labor and materials placed in position and for which payment had been received by Nordic from Windward, the owner. The remaining 10 percent was to be retained by Nordic until completion of the contract, acceptance of the completed project by the architect, contractor and owner, and payment by the owner. In addition, petitioner was to deliver to Nordic a notarized release of all liens arising out of the contract. On June 4, 1958, a letter agreement dated May 20, 1958 was executed between petitioner, Windward and Nordic, which provided that petitioner was to receive Windward's Class A debentures in part payment of its contract with Nordic in an amount not to exceed $132,335. The parties recited the agreement *219 of May 5, 1958 between Nordic and Windward whereby 32 percent of 90 percent of each progress payment was withheld by Windward and charged to the Class A debenture account. The parties then agreed that petitioner was entitled to one-half of each amount so charged. Accordingly, Windward was to credit 50 percent of each withheld sum to Nordic and petitioner, respectively. Since the total amount of petitioner's electrical subcontract with Nordic was less than the $132,335 which was ultimately to be credited to petitioner's account on the books of Windward, it was suggested that Nordic make no payments to petitioner on the subcontract. In accordance with formulas set out in the agreement, it was also provided that petitioner would advance sums to Nordic at the time of each progress payment, where necessary, to maintain parity between the two companies as far as the debenture account with Windward was concerned. This letter agreement was signed by Archer T. Osler and Oscar Winne for Nordic, Carlo Panfiglio for petitioner, and Marvin G. Elton for Windward. During construction, petitioner billed Nordic for electrical work completed in accordance with the original subcontract, as well as *220 additional work agreed to between the parties, as follows: Date of Billing
Amount of Billing
April 30, 1958
$ 11,250.00
May 29, 1958
8,750.00
June 30, 1958
13,750.00
July 31, 1958
11,250.00
August 29, 1958
21,472.58
September 30, 1958
42,413.22
October 31, 1958
14,041.81
December 24, 1958
35,920.62
$158,848.23
Nordic withheld payment on these billings in accordance with the letter agreement dated May 20, 1958. On its books, Nordic entered the withheld amounts in a ledger account titled "Subcontractors Deposits on Stocks and Debentures - Windward City, Ltd." As construction progressed, Nordic billed Windward for work done pursuant to the general contract and these billings were withheld by Windward as authorized by the original agreement of May 5, 1958, and the supplemental letter agreement dated May 20, 1958. The withheld amounts were entered by Windward in a ledger account entitled "Contracts Payable" and a part of those amounts were identified as payable to petitioner in Class A debentures. Periodically Nordic and petitioner, through intercompany cash payments, reconciled any discrepancy between these amounts withheld by Nordic against petitioner *221 and treated as deposits on debentures and amounts withheld by Windward against Nordic and payable to petitioner in Class A debentures. Nordic's settlement on its subcontract with petitioner, as reflected in Nordic's books, was as follows: TOTAL AMOUNTS WITHHELD
By Nordic
By Windward
INTERCOMPANY
Against Pet.
Against Nordic
CASH PAYMENTS
and Treated
and Payable to
By Pet. to
By Nordic
as Deposits
Pet. in Class A Date
Nordic
to Pet.
on Debentures
Debentures
3-58
$ 5,535.00
4-58
$ 10,125.00
18,922.58
5-58
18,000.00
28,717.43
6-58
30,375.00
38,963.39
7-58
$ 8,588.39
49,088.39
52,679.01
8-58
3,590.62
72,004.33
65,541.55
9-58
$ 6,462.78
103,713.45
82,079.60
10-58
21,633.85
94,717.23
107,645.38
11-58
110,625.61
132,335.00
12-58
12-58 Retainage
132,335.00
Add'l small jobs
A.E. pd. by Nordic
4,244.05
14,839.66
16,423.06
42,936.29
132,335.00
+ 42,936.29
- 16,423.06
Final Subcontract Price
$158,848.23
Petitioner completed its subcontract with Nordic during its fiscal year ending October 31, 1959 and received the following *222 in full payment of that contract: Cash (Net)
$ 26,513.23
Class A Debenture No. 8 Issued
by Windward to Petitioner
132,335.00
Total
$158,848.23
Upon receipt of the cash, plus Windward's Class A debenture No. 8, petitioner considered Nordic as having extinguished its monetary obligations for work done pursuant to the subcontract. In the event of a default on the part of Windward with regard to debenture No. 8, petitioner would not look to Nordic as a guarantor. This debenture was issued to petitioner on November 22, 1958, and provided for payment to petitioner of $132,335 on May 7, 1983, with interest on the principal amount at 6 percent per annum commencing three years from the date of the debenture. Interest was payable on the first of April of each year until redemption of the bond and was cumulative, except that accumulations of interest were not to bear interest. The bond represented a charge on all the property of Windward, present or future. It was signed and attested to by Marvin G. Elton and Howard K. Hoddick, respectively, president and secretary of Windward and was subject to certain endorsed conditions. Among these conditions was the fact that it *223 was one of a series of 9 Class A debentures issued by Windward, securing collectively the principal sum of $331,270. These debentures ranked pari passu as a charge upon Windward's property without preference or priority. However, they were subordinate to any of Windward's Class B debentures then outstanding as well as any underlying mortgage indebtedness of the company, but were prior in dignity to the rights of the stockholders. Windward also had the option of paying off the debenture issued to petitioner at any time prior to maturity and without penalty so long as such payment did not make it impossible for the company to meet its obligations on its Class B debentures or underlying mortgage indebtedness. In addition to debenture No. 8 issued to petitioner, Windward issued Class A debentures in the following amounts to the following persons and firms: Debenture
Date of
Face Number
Issue
Amount
Issued To
1
May 7, 1958
$ 25,413.00
John F. Child and Julia E. Child
2
May 7, 1958
12,525.00
Howard L. Cook and Nita W. Cook
3
May 7, 1958
12,525.00
George J. Wimberly and Janet B. Wimberly
4
May 7, 1958
3,500.00
Howard K. Hoddick
5
May 7, 1958
6,737.00
Howard K. Hoddick
6
May 7, 1958
2,950.00
American Electric Company, Ltd.
7
May 7, 1958
2,950.00
Nordic Construction, Ltd.
9
Nov. 22, 1958
132,335.00
Nordic Construction, Ltd.
*224 Pursuant to a request from Windward to Hanson, Raun & Hanson, its auditors, for an estimate as to when and in what amounts the shareholders and debenture holders of the company might expect a payoff on their investments, it was estimated on August 8, 1958 that Windward would sustain substantial losses during its initial years of operation. Specifically, a deficit in earned surplus of $11,463 as of April 1, 1964 was forecast. However, it was estimated that Windward would retire its Class A debentures within 12 years through annual payments of principal and interest beginning in 1961. It was also estimated that the market value of the shopping center in future years could well be considerably higher than book value, due to the taking of accelerated depreciation. All of these forecasts were based on various assumptions including, among others, that permanent financing would be arranged, certain deductions would be allowed, construction costs would not exceed the total contract price and that the estimates of operating expenses and rental income were accurate. The overall estimate was based on the assumed occurrence of a multiplicity of future events and it was quite possible at the *225 time of the estimate that there would be a marked variance between it and the actual results subsequently achieved. On February 3, 1959, Dean Witter & Co., an investment brokerage firm, expressed their opinion in a letter to Nordic that a Windward Class A debenture with a face value of $100 had a net appraisal market value of $56.81. This estimate and its attendant computations were based on the figures computed by Hanson, Raun & Hanson in the estimate it submitted to Windward on August 8, 1958. Petitioner shows Windward's debenture No. 8 on its balance sheet as an investment valued at $79,401, or 60 percent of its face value. Since 1959, Windward has paid no principal or interest outstanding on its Class A debentures. However, it retired its Class B debenture on payment of face value and accrued interest to the holder. It added a bank building and a bowling alley to the shopping center. By June 30, 1964, Windward had eliminated the deficit sustained during its initial years' operations and showed accumulated earnings of $3,345.32. As shown in its annual statements and Federal income tax returns, Windward's assets and liabilities as of June 30, 1957, through June 30, 1964, were *226 as follows: F/Y Ending
Net Worth June 30
Assets
Liabilities *
Capital Stock
Surplus
1957
$ 140,745.94
$ 22,299.06
$125,000.00
($ 6,553.12)
1958
508,647.27
405,150.76
125,000.00
(21,503.49)
1959
982,980.67
918,320.89
125,000.00
(60,340.22)
19 60
929,015.36
887,359.34
125,000.00
(83,343.98)
1961
890,911.69
856,174.27
125,000.00
(90,262.58)
1962
843,496. 86
775,528.29
125,000.00
(57,031.43)
1963
832,397.33
736,386.87
125,000.00
(28,989.54)
1964
1,014,612.65
886,267.33
125,000.00
3,345.32
As shown in the same documents, Windward's annual income for its fiscal years ending June 30, 1957, through June 30, 1964, was as follows: F/Y Ending June 30
Loss
Taxable Income
1957
($ 6,553.12)
1958
(14,950.37)
1959
(38,836.73)
1960
(23,003.76)
1961
( 6,918.60)
1962
$33,086.03 *
1963
28,133.01 *
1964
42,667.80 *
Windward used the face amount of its Class A debentures as its cost of assets and basis of assets in claiming accelerated depreciation for Federal income tax *227 purposes until June 30, 1961. Thereafter, it switched to the straight line method using the same cost of assets and basis of assets. It carried on its records the face amount of the Class A debentures issued to petitioner and Nordic as extinguishing an equivalent sum due Nordic for work done pursuant to the general contract. The fair market value of the Windward Class A debentures at the time of the completion of the contract was $79,401. On October 31, 1959, petitioner paid $600 each to its two stockholders, recorded this payment in its books, and deducted this amount on its Federal income tax return as travel and entertainment expenses. On its income tax return for the fiscal year ending October 31, 1959, petitioner deducted travel and entertainment expense of $8,200.91, including the above $1200 payments. At various times during this year, Panfiglio and Hulick claimed and were paid reimbursement for travel and entertainment expense incurred on petitioner's behalf. In the opinion of Panfiglio, the $1200 paid on October 31, 1959 represents reimbursement for the cost of home entertainment, or other entertainment accomplished on petitioner's behalf by its stockholders during *228 the prior year where a credit card was not acceptable. Panfiglio kept no record of this entertainment and he did not identify the dates, persons entertained or their business relationship to petitioner. Hulick did not testify at trial. During its fiscal year ending October 31, 1959, petitioner paid or incurred personal expenses on behalf of its stockholders in the amount of $2,805.47 incident to the operation of company automobiles by the wives of Panfiglio and Hulick. Petitioner entered these payments on its books and in its Federal income tax return as automobile expenses. Amounts expended by petitioner to Panfiglio and Hulick on October 31, 1959 in the aggregate amount of $1200 were not paid as compensation for services rendered or incurred as entertainment expenses. Amounts in the aggregate of $2,805.47 expended by petitioner during the fiscal year ending October 31, 1959, incident to the operation of company automobiles by the wives of Panfiglio and Hulick do not represent amounts paid as compensation for services rendered. In the statement accompanying the notice of deficiency, the adjustments made by the Commissioner were explained as follows: (a) It is determined *229 that your income, under the completed contract basis of accounting, from a subcontract with Nordic Construction, Ltd., to perform all electrical work for the Windward City Shopping Center, reflected your total billings under that subcontract of $158,848.23 rather than $105,914.23 as returned. Your taxable income is, therefore, increased by $52,934.00. (b) and (c) The deductions of $1,200 and $2,805.46 claimed for entertainment and automobile expenses respectively, have been disallowed because it has not been established that the amounts constitute ordinary and necessary business expenses or were expended for the purpose designated. Opinion Simply stated, the significant issue in this case is whether a corporate electrical subcontractor reporting its income on the completed-contract basis of accounting must, in the year the contract is completed, report for tax purposes the sum of the cash received under the subcontract plus the face value of a 25-year debenture, or cash plus the fair market value of the debenture. If it is decided that the proper method is cash plus the fair market value of the debenture, it remains for that value to be determined. If it is decided that the proper *230 method is cash plus the face value of the debenture, a further question remains as to whether a bad debt or other deduction can be claimed in the year of completion. Section 451 of the Internal Revenue Code of 1954 provides generally that items of gross income are normally included in gross income in the year of receipt unless they are to be properly accounted for as of a different period, in accordance with taxpayer's method of accounting. [1] The regulations under that section provide for two methods of reporting income from long-term contracts; the percentage of completion and the completed-contract method. For the purposes of these methods, long-term contracts mean building, installation, or construction contracts whose terminal date is in excess of one year from the date of execution. [2] Under the completed-contract method, gross income from long-term contracts may be reported for the taxable year in which the contract is completed and the work accepted. [3] The crux of the method is that the proper time to accrue the income and expenses from the contract is at the time of completion, as opposed to accruing the income and expenses on the basis of annual *231 accounting periods. To this extent, at least, it differs from the more usual accrual method of accounting in that both gross income and deductions attributable to the particular contract are deferred for tax purposes until the year of completion. *232 In the instant case, the parties are in agreement that petitioner correctly made use of the completed-contract method in reporting its contract with Nordic in 1959. No question arises as to when the method of accounting in this case becomes operative or that the contract was in fact completed during the year in issue. Thus, petitioner reflected total billings on its books for completion of the subcontract with Nordic in 1959 in the amount of $158,848.23. However, prior to the year of completion and in accordance with a tripartite agreement involving petitioner, Nordic and Windward, it agreed to accept debenture bonds from Windward at full face value and in part payment of its subcontract with Nordic. The result was that Nordic's obligation to petitioner was extinguished in the year of completion by the payment of $26,513.23 in cash plus Windward's Class A debenture No. 8 which was issued in the face amount of $132,335. Petitioner included this debenture in its balance sheet at 60 percent of its face value, or $79,401, and reported for tax purposes a completed contract of $105,914.23. Respondent increased petitioner's taxable income by the difference between the total billings on *233 petitioner's books and the amount of the completed contract reported, or $52,934. Petitioner takes the position that it should report the sum of the cash received plus the fair market value of the debenture. This position is based on the fact that, in accordance with the supplemental agreement between Nordic (the contractor) and Windward (the owner), Nordic had a right to extinguish its obligation under its subcontract with petitioner in part by the issuance of the 6 percent 25-year debenture by windward in lieu of a full cash payment on the part of Nordic. Since part payment was received for services other than in money, petitioner contends that sections 1.61-2(d)(1) and 1.61-2(d)(4), Income Tax Regs., require only that the fair market value of the property taken in payment be included in income. Section 1.61-(2)(d)(1) substantially echoes petitioner's theory [4] and section 1.61-2(d)(4) provides in part that notes or other evidences of indebtedness received in payment for services by an employee or independent contractor constitute income in the amount of their fair market value at the time of the transfer. [5] Petitioner also cites footnote 10 of Schlude v. Commissioner, 372 U.S. 128, 136 (1963) *234 [6] for the same proposition and contends further that the fair market value of the debenture has been proved by the evidence.
*235 If it is decided that petitioner should have reported the face amount of the debenture, petitioner takes the alternative position that a bad debt deduction in an amount equal to 30 percent or more of the face value of the debenture should be allowed. Respondent's position is that the debenture represents income earned by petitioner pursuant to the completion of its Windward City subcontract and that, since a right to that amount was earned in the fiscal year 1959, the year of completion, petitioner must accrue the full amount of that right as income under the completed-contract method of accounting. Petitioner's alternative claim for a bad debt or other deduction is countered by respondent's view that such a deduction is not allowable because Nordic was never indebted to petitioner for the earned but unpaid portion of the subcontract price. Even assuming such a debt existed, the respondent claims petitioner has not demonstrated that $52,934 of this debt became uncollectible during the fiscal year in issue or that debenture No. 8 had a fair market value less than its face value. Respondent relies initially upon those cases stating the general rule with respect to the completed-contract *236 method of accounting, particularly those emphasizing the fact that the method becomes operative in the year the contract is completed and that it is the right to receive and not the actual receipt which determines the inclusion. National Contracting Co., 37 B.T.A. 689, 701 (1938), affd. 105 F. 2d 488 (C.A. 8, 1939); Clark v. Woodward Construction Co., 179 F. 2d 176 (C.A. 10, 1950); Daley v. United States, 243 F. 2d 466, 476 (C.A. 9, 1957), certiorari denied 355 U.S. 832 (1957); Dally v. Commissioner, 227 F. 2d 724, 726 (C.A. 9, 1955), certiorari denied 351 U.S. 908 (1956). In effect, respondent would treat petitioner like any other accrual basis taxpayer and would require the debenture to be taken into income at face value. Any valuation of petitioner's right to payment under the debenture would, if at all, be reflected in an allowance for a bad debt or other deduction. Respondent relies primarily on Spring City Co. v. Commissioner, 292 U.S. 182 (1934); First Savings & Loan Association, 40 T.C. 474, 487 (1963). Particular emphasis is placed on the First Savings *237 & Loan Association case, in which an accrual basis taxpayer sold improved real estate on 35-year notes and mortgages with little or no down payment. In rejecting taxpayer's argument, that the fair market value of the notes should be used in computing and reporting gain in the year of sale under section 1001(b) of the Code, we pointed out that an accrual basis taxpayer does not treat an unconditional right to receive money as property received, but, rather, as money received to the full extent of the face value of the right, irrespective of the fact that section 1001(b) provides that the amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. To this effect, we cited Key Homes, Inc., 30 T.C. 109 (1958), affirmed per curiam 271 F. 2d 280 (C.A. 6, 1959), and Spring City Co. v. Commissioner, supra.See also Bolling v. Commissioner, 17 A.F.T.R. 2d 451 (C.A. 8, Feb. 28, 1966), affirming in part on a similar issue T.C. Memo. 1964-143. Petitioner counters these arguments with the contention that the First *238 Savings & Loan Association case is no longer applicable in view of the Supreme Court's decision in Schlude, and that our decision following Schlude in Gunderson Bros. Engineering Corp., 42 T.C. 419 (1964) is controlling. In Gunderson we held that a taxpayer who sold motor vehicles on installment payment plans need not accrue finance charges reflected in the face amounts of promissory notes in the year of sale where the purchasers had a statutory right under state law to a partial refund of the finance charges upon early payment of the installment contracts. Respondent distinguishes Gunderson on the grounds that, since it was found that the taxpayer did not acquire a fixed and unqualified right to the finance charges when the vehicles were sold, the issue was not reached as to whether the finance charges should have been accrued in the year of sale, assuming at that time the taxpayer had acquired a fixed, unqualified right to those charges. Thus, as respondent puts it, Gunderson did not rule on the issue of whether an accrual basis taxpayer who has earned a right to payment by performing personal services, or through the sale of property, may defer the accrual of any part *239 of that right on the theory that the fair market value of that right is less than its face value. On the evidence of record, we think the dominant issue in this case is narrower than is indicated by any of the contentions of the parties and we hold, upon the particular facts of this record and a plain and narrow reading of the applicable statutes and regulations, that it was proper for petitioner to report for tax purposes in the year the contract was completed the amount received in cash plus the fair market value of the 25-year debenture. We do so on grounds substantially dissimilar from those found in the various alternative arguments and numerous precedents cited by the parties. It is to be noted at the outset that the issue in this case does not span the broad, litigation-riddled horizon of tax accounting for acrual basis taxpayers. The taxpayer here reported its income pursuant to the completed-contract method as it is specifically and narrowly defined in the regulations. And, however may be characterized what the taxpayer here received pursuant to the completion of its subcontract during the year in issue, it was received by virtue of the rendering of services under an electrical *240 subcontract. Consequently, the issue in question as ultimately framed by the respondent is too broad. The question is not whether an accrual basis taxpayer, who has earned a right to payment by performing personal services, or through the sale of property, may defer accruing any part of that right in income on the theory that the fair market value of that right is less than its face value. Rather, the question goes to the nature and value of a right to payment received by a taxpayer who properly utilized the completed-contract method of reporting income and in fact completed the contract during the year in issue. As stated above, no question arises as to the use of this method or the point in time in which the method becomes operative. Nor does any question arise with respect to the fact that the completed-contract method has long been accepted as a method which can clearly reflect income. Fort Pitt Bridge Works, 24 B.T.A. 626 (1931), affirmed this issue 92 F. 2d 825 (C.A. 3, 1937), certiorari denied 303 U.S. 659 (1937); Edward J. Hudson, 11 T.C. 1042 (1948), affirmed per curiam sub nom. Hudson Engineering Corporation v. Commissioner, 183 F. 2d 180 *241 (C.A. 5, 1950), and 184 F. 2d 518. While we have found no cases which squarely face this issue, our earlier decisions, particularly the Hudson case, supra, provide some appropriate guidelines. The facts in Hudson with respect to the issue of the year of accrual for a completed-contract basis taxpayer offer a parallel to the facts of the instant case. In that case, pursuant to a processing contract, Hudson was to construct a recycling plant at his own expense to extract hydrocarbons from natural gas. A corporation called Distillate was formed to own and operate the plant and it entered into a contract with Hudson Engineering Corporation to construct a processing plant at an estimated cost of $849,270 plus a fee of $120,000. Payment of the fee became a fixed obligation upon completion of the plant and commencement of operations but was subordinate in payment to various notes and obligations to equipment vendors and others and later to a large bank debt. The completion of the plant, as well as the subordination of the $120,000 fee to various other notes, obligations and liabilities, all occurred during 1943, the year the contract was completed. Distillate sustained net *242 losses in each year up through 1944 and its balance sheet for that fiscal year showed a deficit of approximately $69,000. For its fiscal year ended July 31, 1944, the year of completion, Hudson Engineering Corporation did not include the $120,000 fee in its reported income but the Commissioner, in his determination of deficiency, included $50,000 of that amount in Hudson's income. We accepted the respondent's determination with reference to the $120,000 fee and held that the taxpayer was required to accrue in the year of completion of the contract $50,000 of the fee connected therewith because of failure of proof that payment of the fee was subject to any reasonable uncertainty at the end of that year. We pointed out that in order to avoid accrual of the fee, petitioner would have to prove that as early as the end of that year some contingency or reasonable uncertainty about the ultimate payment was known to exist which would justify petitioner's failure to accrue and report this item. National Contracting Co., supra at 701 et seq. We also pointed out that respondent's inclusion of only $50,000 of the $120,000 in income for that year indicated that he thought there *243 was sufficient uncertainty as to payment to excuse petitioner from accruing the balance. We allowed respondent's inclusion of the $50,000 in view of the fact that it was incumbent upon petitioner to show that there was similar uncertainty as to that amount, but he failed to sustain his burden of proof. Edward J. Hudson, supra at 1050. We think the guidelines found in Hudson are equally applicable to the instant case. In Hudson, the Commissioner examined the uncertainties surrounding petitioner's fixed and determined right to receive the fee in the year of the completion of the contract and made a determination that the value of that fixed right at that point in time was considerably less than the face amount called for in the contract. We see little difference between that situation and the instant case in which the petitioner had a fixed and determinable right in the year of completion to $26,513.23 in cash plus a 6 percent 25-year debenture in the face amount of $132,335 which, at that same point in time, he seeks to value and include in income at a lesser amount than face value. As we see it, the only matter for adjudication is the value of the debenture when received *244 for purposes of determining the inclusion in the year of completion. Following the guidelines found in Hudson and National Contracting Co., both supra, petitioner must show contingencies or reasonable uncertainties extant in the year of completion in order for taxability of the full amount to be postponed. We think this treatment is squarely in line with respondent's long-established treatment with respect to the inclusion in gross income of negotiable notes and other evidences of indebtedness in the regulations under section 61 of the 1954 Code. On their face, these regulations directly reinforce the treatment we have accorded the debenture received by petitioner in the year the contract was completed. Section 1.61-2(d)(1) provides simply that if services are paid for in something other than money, the fair market value of that which was received is included in income. If a price for the services rendered is stipulated, there is a presumption that the stipulated price is the fair market value in the absence of contrary evidence. [7] As applied to the instant case, the debenture is presumed to be worth its face value of $132,335, absent evidence to the contrary. Section 1.61-2(d)(4) *245 relates specifically to stock and notes transferred by a corporation to an employee or independent contractor as compensation for services rendered. In the case of a transfer of the corporation's own stock, the fair market value at the time of transfer is includable in gross income. Notes or other evidences of indebtedness are includable in gross income at their fair market value at the time of the transfer. [8] Again, the rationale of this regulation as applied to the instant case is the same: the only issue raised by petitioner's receipt of the debenture in part payment for services rendered pursuant to a completed contract in 1959 is the fair market value to be ascribed to the right to income represented by that instrument, or evidence of indebtedness. Turning to the issue of the valuation of the debenture, we are satisfied from the evidence that petitioner's valuation of that instrument in the year of the completion of the contract was reasonable and was based on competent appraisals. These appraisals were explained and supported by the testimony of expert witnesses at the trial. As found in our facts the debenture had *246 a fair market value of $79,401 when the contract was completed. We hold for petitioner on this issue. The remaining issues relate to the unsubstantiated entertainment expenses in the amount of $1,200 purportedly paid by petitioner to its president and vice-president for alleged business entertainment and the disallowance of $2,805.47 in automobile expenses claimed by petitioner and expended for the operation of company automobiles by the wives of Panfiglio and Hulick. With respect to the travel and entertainment expenses, petitioner relies on Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930), and several other cases which are not particularly helpful where, as here, the issue is primarily one of fact. Petitioner does not argue, on brief, the issue of the purported automobile expenses. Respondent counters these arguments by pointing out that a deduction for home entertainment is one that is particularly susceptible of abuse and that one claiming this type of deduction must show a proximate relationship between the entertainment and the business of the taxpayer. Reliance is placed on Challenge Manufacturing Co., 37 T.C. 650, 660 (1962). Respondent relies *247 on the same rationale and precedent with respect to the amounts treated as automobile expenses. In view of our findings of fact, we hold for respondent on both of these issues. Petitioner does not seriously argue, on brief, either of these two issues and we find this understandable in view of the fact that no evidence was placed in the record to show the identity of the persons entertained, the frequency of the entertainment, the cost of the entertainment or the relationship of this entertainment to petitioner's business activities. Moreover, the purported travel and entertainment expenses of $1,200 are part of a total sum of $8,200.91 deducted by petitioner in 1959. All amounts, except the $1,200, were documented by the petitioner and allowed by the respondent, and in view of this we fail to see why petitioner could not produce at least some evidence to substantiate these purported expenses. Apparently it is petitioner's view that because of the large disparity between its gross receipts and the amount expended for entertainment in 1959, its president and vice-president should be allowed to deduct a lump sum at the end of that year as reimbursement for unsubstantiated home and other *248 entertainment costs. We are not familiar with any case standing for this proposition, nor are we convinced that the petitioner here has produced enough evidence to come within the ambit of the Cohan rule. Consequently we hold that this amount is not deductible either as entertainment expense or compensation paid to its shareholders. Much the same reasoning applies to the purported automobile expenses and, we pointed out, petitioner has abandoned this issue on brief. We conclude that the $2,805.47 paid or incurred by petitioner for personal expenses of its stockholders and treated as automotive expenses is not deductible as compensation. Decision will be entered under Rule 50. Footnotes
*. (c) - cash; (p) - property; (s) - services.↩
*. Including Class A debentures and mortgage loan.↩
*. Before net operating loss carryforwards.↩
1. SEC. 451. GENERAL RULE FOR TAXABLE YEAR OF INCLUSION. (a) General Rule. - The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period. ↩
2. Income Tax Regs. Sec. 1.451-3 Long-term contracts. (a) Definition. The term "long-term contracts" means building, installation, or construction contracts covering a period in excess of one year from the date of execution of the contract to the date on which the contract is finally completed and accepted. ↩
3. Sec. 1.451-3(b)(2) of the regulations provides as follows: (2) Completed contract method. Gross income derived from long-term contracts may be reported for the taxable year in which the contract is finally completed and accepted. Under this method, there shall be deducted from gross income for such year all expenses which are properly allocable to the contract, taking into account any material and supplies charged to the contract but remaining on hand at the time of completion.↩
4. Sec. 1.61-2 Compensation for services, including fees, commissions, and similar items. (d) Compensation paid other than in cash - (1) In general. If services are paid for other than in money, the fair market value of the property or services taken in payment must be included in income. If the services were rendered at a stipulated price, such price will be presumed to be the fair market value of the compensation received in the absence of evidence to the contrary. * * * ↩
5. Sec. 1.61-2(d)
(4) Stock and notes transferred to employee or independent contractor. Except as otherwise provided by section 421 and the regulations thereunder (relating to employee stock options) and § 1.61-15↩, if a corporation transfers its own stock to an employee or independent contractor as compensation for services, the fair market value of the stock at the time of transfer shall be included in the gross income of the employee or independent contractor. Notes or other evidences of indebtedness received in payment for services constitute income in the amount of their fair market value at the time of the transfer. A taxpayer receiving as compensation a note regarded as good for its face value at maturity, but not bearing interest, shall treat as income as of the time of receipt its fair discounted value computed at the prevailing rate. As payments are received on such a note, there shall be included in income that portion of each payment which represents the proportionate part of the discount originally taken on the entire note. 6. Footnote 10 of the Schlude case is as follows: "Negotiable notes are regarded as the equivalent of cash receipts, to the extent of their fair market value, for the purposes of recognition of income. § 39.22(a)-4, Treas. Reg. 118, 1939 Code; § 1.61-2(d)(4), Treas. Reg., 1954 Code; Mertens, Federal Income Taxation (1961), § 11.07. See Pinellas Ice Co. v. Commissioner, 287 U.S. 462↩."
7. See footnote 4, supra. ↩
8. See footnote 5, supra.↩